**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MITCHELL DAKS,<br><br>        Plaintiff,<br><br>  v.<br><br><br><br>ZYNGA INC., MARK PINCUS, FRANK GIBEAU, REGINA E. DUGAN, WILLIAM GORDON, LOUIS J. LAVIGNE, JR., CAROL G. MILLS, JANICE M. ROBERTS, ELLEN F. SIMINOFF, and NOEL WATSON,<br><br>        Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mitchell Daks ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Zynga, Inc. ("Zynga" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Zynga and the Defendants.

**SUMMARY OF THE ACTION**

1.      This is an action brought by Plaintiff against Zynga and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed transaction (the "Proposed Transaction") between the Company and Take-Two Interactive Software, Inc. ("Take-Two").

2.      On January 9, 2022, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Take-Two, Zebra MS I, Inc. ("Merger Sub 1"), a wholly owned subsidiary of Take-Two, and Zebra MS II, Inc. ("Merger Sub 2"), a wholly owned subsidiary of Take-Two.  Pursuant to the terms of the Merger Agreement, Merger Sub 1 will merge with and into Zynga, with Zynga surviving the merger as a wholly owned subsidiary of Take-Two (the "First Merger"). Following the First Merger, Zynga will merge with and into Merger Sub 2, with Merger Sub 2 continuing as the surviving corporation (the "Second Merger" and together with the First Merger, the "Mergers"). As a consequence of the Mergers, the Company's shareholders will receive $3.50 in cash and $6.36 in shares of Take-Two (within a 7.5% symmetrical collar based on a Take-Two share price of $169.19 as the midpoint) for each share of Zynga common stock they own (the "Merger Consideration").

3.      On March 14, 2022, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading registration statement with the SEC (the "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Zynga and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed

Transaction unless and until the material information discussed below is disclosed to Zynga shareholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**THE PARTIES**

8.     Plaintiff is, and has been at all times relevant hereto, the owner of Zynga shares.

9.     Defendant Zynga is incorporated under the laws of Delaware and has its principal executive offices located at 699 Eight Street, San Francisco, California 94103.  The Company's common stock trades on the NASDAQ under the symbol "ZNGA."

10.     Defendant Mark Pincus ("Pincus") is and has been the Chairman of the Board of Zynga at all times during the relevant time period.

11.     Defendant Frank Gibeau ("Gibeau") is and has been the Chief Executive Officer ("CEO") and a director of Zynga at all times during the relevant time period.

12.     Defendant Regina E. Dugan ("Dugan") is and has been a Zynga director at all times during the relevant time period.

13.     Defendant William Gordon ("Gordon") is and has been a Zynga director at all times during the relevant time period.

14.     Defendant Louis J. Lavigne Jr. ("Lavigne") is and has been a Zynga director at all times during the relevant time period.

15.     Defendant Carol G. Mills ("Mills") is and has been a Zynga director at all times during the relevant time period.

16.     Defendant Janice M. Roberts ("Roberts") is and has been a Zynga director at all times during the relevant time period.

17.     Defendant Ellen F. Siminoff ("Siminoff") is and has been a Zynga director at all times during the relevant time period.

18.     Defendant Neol Watson ("Watson is and has been a Zynga director at all times during the relevant time period.

19.     Defendants Pincus, Gibeau, Dugan, Gordon, Lavigne, Mills, Roberts, Siminoff, and Watson are collectively referred to herein as the "Individual Defendants."

20.     The Individual Defendants, along with Defendant Zynga, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

21.     Zynga, develops, markets, and operates social game services in the United States and internationally. The Company provides social games as live services played on mobile platforms, such as Apple iOS and Google's Android operating systems; social networking platforms, such as Facebook and Snapchat; and personal computers consoles, such as Nintendo's Switch game console, and other platforms and consoles. It also provides advertising services comprising mobile advertisements, engagement advertisements and offers, and branded virtual items and sponsorships for marketers and advertisers; and licenses its own brands. In addition, the Company operates mobile programmatic advertising and monetization platform.

## The Company Announces the Proposed Transaction

22.     On January 10, 2022, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

NEW YORK & SAN FRANCISCO--(BUSINESS WIRE)--Take-Two Interactive (NASDAQ: TTWO) (the "Company") and Zynga (NASDAQ: ZNGA), two leaders in interactive and mobile entertainment, today announced that they have entered into a definitive agreement, under which Take-Two will acquire all of the outstanding shares of Zynga in a cash and stock transaction valued at $9.86[1] per Zynga share, based on the market close as of January 7, 2022, with a total enterprise value of approximately $12.7 billion. Under the terms and subject to the conditions of the agreement, Zynga stockholders will receive $3.50 in cash and $6.36[1] in shares of Take-Two common stock for each share of Zynga common stock outstanding at the closing of the transaction. The purchase price represents a premium of 64% to Zynga's closing share price on January 7, 2022.

This transformative combination unifies two global leaders in the interactive entertainment business and establishes Take-Two as one of the largest and most diversified mobile game publishers in the industry, with $6.1 billion in pro-forma Net Bookings for the trailing twelve-month period ended September 30, 2021.

Both companies have created and expanded iconic franchises, which will combine to form one of the largest and most diverse portfolios of intellectual properties in the sector. Take-Two's labels are home to some of the most beloved series in the world, including *Grand Theft Auto®, Red Dead Redemption®, Midnight Club®, NBA 2K®, BioShock®, Borderlands®, Civilization®, Mafia®,* and *Kerbal Space Program®*, while Zynga's portfolio includes renowned titles, such as *CSR*

*Racing™, Empires & Puzzles™, FarmVille™, Golf Rival™, Hair Challenge™, Harry Potter: Puzzles & Spells™, High Heels! ™, Merge Dragons!™, Toon Blast™, Toy Blast™, Words With Friends™,* and *Zynga Poker™.*

**Management Comments**

"We are thrilled to announce our transformative transaction with Zynga, which significantly diversifies our business and establishes our leadership position in mobile, the fastest growing segment of the interactive entertainment industry," said Strauss Zelnick, Chairman and CEO of Take-Two. "This strategic combination brings together our best-in-class console and PC franchises, with a market-leading, diversified mobile publishing platform that has a rich history of innovation and creativity. Zynga also has a highly talented and deeply experienced team, and we look forward to welcoming them into the Take-Two family in the coming months. As we combine our complementary businesses and operate at a much larger scale, we believe that we will deliver significant value to both sets of stockholders, including $100 million of annual cost synergies within the first two years post-closing and at least $500 million of annual Net Bookings opportunities over time."

"Combining Zynga's expertise in mobile and next-generation platforms with Take-Two's best-in-class capabilities and intellectual property will enable us to further advance our mission to connect the world through games while achieving significant growth and synergies together," said Frank Gibeau, CEO of Zynga. "I am proud of our team's hard work to deliver a strong finish to 2021, with one of the best performances in Zynga's history. We are incredibly excited to have found a partner in Take-Two that shares our commitment to investing in our players, amplifying our creative culture, and generating more value for stockholders. With this transformative transaction, we begin a new journey which will allow us to create even better games, reach larger audiences and achieve significant growth as a leader in the next era of gaming."

**Strategic Rationale and Stockholder Value Creation**

With Zynga's stockholders receiving approximately 64.5%[1] of the transaction consideration in Take-Two stock, both groups of stockholders will benefit from the combined company's greater scale, enhanced financial profile, and the synergies created through the transaction.

**Combined company is well-positioned to capitalize on the interactive entertainment industry's strong tailwinds, including a leadership position in mobile.** The video game sector has experienced rapid growth over the last few years and is now the largest vertical in the entertainment industry[2]. Mobile gaming is the fastest growing segment within the industry, with an estimated $136 billion[2] in gross bookings in 2021, and an expected compound annual growth rate of 8%[2] over the next three years. The transaction is expected to establish Take-

Two as a leader in mobile gaming, with mobile expected to comprise over 50% of its Net Bookings in Fiscal Year 2023 (as compared to an estimated 12% in Fiscal Year 2022). The transaction will bolster Take-Two's mobile offerings, which include popular games such as *Dragon City, Monster Legends, Top Eleven*, *Two Dots,* and *WWE SuperCard*, and consist of a diverse array of titles that focus on many of the most popular genres in mobile gaming, including casual, hyper-casual, lifestyle, mid-core, puzzle, social casino and sports games.

**Formation of an industry-leading portfolio, comprising Take-Two's best-in-class intellectual properties and Zynga's renowned mobile titles.** The transaction will create a powerful and diverse portfolio of industry-leading titles that span key platforms and genres across interactive entertainment, developed by some of the most creative and forward-thinking talent within the industry. By sharing best practices and key data insights across the enterprise, the Company is expected to benefit from significant development and publishing synergies, unlock new revenue streams and reach new audiences around the world.

**The combined entity has significantly greater scale,** with $6.1 billion in Net Bookings, and $769 million[3] in Adjusted Unrestricted Operating Cash Flow on a pro-forma basis for the trailing twelve-month period ended September 30, 2021. Looking ahead, the combined company is expected to deliver a 14%[4] compound annual growth rate for Net Bookings (excluding the annual Net Bookings opportunities and any future acquisitions) over the three-year period from Take-Two's Fiscal Years 2021 through 2024.

**Addition of Zynga's mobile titles will expand the Company's base of Recurrent Consumer Spending ("RCS").** Through the addition of Zynga's mobile business, particularly its diversified portfolio of live services and upcoming pipeline of new releases, Take-Two will increase its sources of RCS, a highly-attractive revenue stream that helps reduce volatility across reporting periods that has historically been driven by the cadence of Take-Two's console and PC release slate.

**Take-Two has also identified over $500 million of incremental annual Net Bookings opportunities to unlock over time, driven by:**

> **Creation of new mobile games for many of the iconic franchises within Take-Two's portfolio of intellectual property.** Take-Two has an extensive catalog of commercially and critically successful console and PC titles with engaged and loyal communities of players, and there is a meaningful opportunity to create mobile games and new cross-platform experiences for many of these properties. Zynga's nearly 3,000 employees include highly-talented mobile developers, paving the way for Take-Two to accelerate this strategic initiative and introduce its iconic intellectual properties across the fastest-growing platform in the industry.

**Ability to optimize RCS by leveraging the collective knowledge across both companies.** Both Take-Two and Zynga have extensive capabilities to engage players through live operations ("LiveOps") and RCS initiatives. By combining resources and proven acumen, the teams at Take-Two and Zynga will deploy best-in-class practices throughout the organization to enhance and grow existing titles across the portfolio. Key opportunities include cross-marketing through a larger, shared customer database and improving game economies through more effective data analytics and machine learning models.

**Other strategic benefits** include the use of Zynga's Chartboost advertising platform, which will improve new user acquisition through better audience targeting and optimize mobile advertising inventory to achieve greater yields; geographic expansion into growth markets across Asia, including India, and the Middle East, among other regions; and an enhanced focus on technological innovation and new business models that will utilize the collective knowledge of forward-thinking talent.

**Take-Two expects approximately $100 million of annual cost synergies** within the first two years after closing, primarily driven by the rationalization of duplicative overhead including corporate general and administrative expenses and public company costs, as well as the benefit of scale efficiencies across the enterprise.

**The acquisition is structured to maintain a strong balance sheet**, including significant annual cash generation. The combined company's strategic and financial flexibility is expected to be greater than each company on a standalone basis, providing Take-Two with the financial resources to continue to invest in talent, development, and innovation, while also pursuing select inorganic growth opportunities.

## Leadership

At the close of the transaction, Strauss Zelnick will continue to serve as Chairman and CEO, and the management team of Take-Two will continue to lead the combined company. Zynga's highly skilled and proven management team, led by Frank Gibeau and Zynga's President of Publishing, Bernard Kim, will drive the strategic direction for Take-Two's mobile efforts and will oversee the integration, and day-to-day operations of the combined Zynga and T2 Mobile Games business, which will operate under the Zynga brand as its own label within the Company. Additionally, Take-Two will expand its Board of Directors to 10 members upon the closing of the transaction to add two members from Zynga's Board of Directors.

## Terms of the Acquisition

Zynga stockholders will receive $3.50 in cash and $6.36[1] in shares of Take-Two common stock for each share of Zynga common stock outstanding at the closing. The transaction is valued at $9.86[1] per share of Zynga common stock based on the market closing as of January 7, 2022, implying an enterprise value of approximately $12.7 billion.

The transaction includes a collar mechanism on the equity consideration, so that if Take-Two's 20-day volume weighted average price ("VWAP") ending on the third trading day prior to closing is in a range from $156.50 to $181.88, the exchange ratio would be adjusted to deliver total consideration value of $9.86 per Zynga share (including $6.36 of equity value based on that VWAP and $3.50 in cash). If the VWAP exceeds the higher end of that range, the exchange ratio would be 0.0350 per share, and if the VWAP falls below the lower end of that range, the exchange ratio would be 0.0406 per share.

Within the collar range, the final number of Take-Two shares estimated to be issued on a fully diluted basis will range between approximately 50.3 million and 58.5 million shares. Upon closing of the transaction, current Take-Two stockholders will own between 67.2% and 70.4% and current Zynga stockholders are expected to own between 29.6% and 32.8% of the combined company on a fully diluted basis, respectively, including the shares associated with expected settlement of Zynga's two outstanding series of convertible notes due 2024 and 2026.

As part of the transaction, Take-Two has received committed financing of $2.7 billion from J.P. Morgan and intends to fund the cash component of the transaction through a combination of cash from its balance sheet as well as proceeds of new debt issuance.

The merger agreement provides for a "go-shop" provision under which Zynga and its Board of Directors may actively solicit, receive, evaluate, and potentially enter negotiations with parties that offer alternative proposals during a 45-day period following the execution date of the definitive agreement, expiring on February 24, 2022. There can be no assurance this process will result in a superior proposal. Zynga does not intend to disclose developments about this process unless and until its Board of Directors has made a decision with respect to any potential superior proposal.

[1]*Within a 7.5% symmetrical collar based on a Take-Two share price of $169.19 as the midpoint.*
[2] *Source: IDG Consulting.*
[3] *Based on the trailing twelve-month period ended September 30, 2021. Combines Take-Two's Adjusted Unrestricted Operating Cash Flow of $467 million and Zynga's Operating Cash Flow of $302 million.*
[4] *Due to different fiscal year ends, appropriate modifications were made to calculate information based on Take-Two's fiscal year end.*

**Approvals and Close Timing**

The transaction, which is expected to be completed during the first quarter of Take-Two's Fiscal Year 2023, ending June 30, 2022, is subject to the approval of both Take-Two and Zynga stockholders and the satisfaction of customary closing conditions, including applicable regulatory approvals.

The transaction has been unanimously approved by the Take-Two and Zynga Boards of Directors. Moreover, each director and executive officer of Take-Two and Zynga have entered into voting agreements to support the transaction.

**Advisors**

J.P. Morgan and LionTree Advisors are serving as financial advisors to Take-Two and Willkie Farr & Gallagher LLP is serving as legal counsel. Goldman Sachs & Co. LLC is acting as financial advisor to Zynga and Wilson Sonsini Goodrich & Rosati, Professional Corporation is serving as legal counsel.

## FALSE AND MISLEADING STATEMENTS

## AND/OR MATERIAL OMISSIONS IN THE REGISTRATION STATEMENT

23.     On March 14, 2022, the Company authorized the filing of the Registration Statement with the SEC.    The Registration Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

24.     Defendants were obligated to carefully review the Registration Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.    However, the Registration Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### <u>Misrepresentations or Omissions Regarding the Financial Projections</u>

25.    The Registration Statement contains projections prepared by the Company's and Take-Two's management concerning the Proposed Transaction, but fails to provide material information concerning such.

26.    The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

27.    In order to make management's projections included in the Registration Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

28.    Specifically, with respect to the Take-Two's projections, Take-Two must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Adjusted Net Income; (ii) Adjusted EBITDA; (iii) Adjusted Unrestricted Operating Cash Flow; and (iv) Unlevered Free Cash Flow.

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

29.     With respect to the Synergy projections, Synergy must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measure, Operating Contribution from Net Booking Opportunities.

30.     With respect to the Company's Projections - Standalone, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Bookings; and (ii) Adjusted EBITDA.

31.     With respect to the Company's Projections – Standalone, updated as of December 29, 2021, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Bookings; (ii) Adjusted EBITDA; and (iii) Unlevered Free Cash Flow.

32.     With respect to the Combined Company Projections, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) Bookings; (ii) Adjusted EBITDA; and (iii) Unlevered Free Cash Flow.

33.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.  Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

### Material False and Misleading Statements or Material Misrepresentations or Omissions Regarding the Financial Opinions

34.     The Registration Statement contains the financial analyses and opinion of J.P. Morgan Securities, LLC ("J.P. Morgan"), Liontree Advisors, LLC ("Liontree" and together with J.P. Morgan, "Take-Two's Financial Advisors"), and Goldman Sachs & Co. LLC ("Goldman

Sachs") concerning the Proposed Transaction, but fails to provide material information concerning such.

35.     With respect to Take-Two's Financial Advisors *Public Trading Multiples Analysis* for Zynga, the Registration Statement fails to disclose the individual multiples and metrics for each of the companies observed in the analysis.

36.     With respect to Take-Two's Financial Advisors *Public Trading Multiples Analysis* for Take-Two, the Registration Statement fails to disclose the individual multiples and metrics for each of the companies observed in the analysis.

37.     With respect to Take-Two's Financial Advisors *Transaction Multiples Analysis* for Zynga, the Registration Statement fails to disclose the individual multiples and metrics for each of the transactions observed in the analysis.

38.     With respect to Take-Two's Financial Advisors *Transaction Multiples Analysis* for Take-Two, the Registration Statement fails to disclose the individual multiples and metrics for each of the transactions observed in the analysis.

39.     With respect to Take-Two's Financial Advisors *Discounted Cash Flow Analysis* for Zynga, the Registration Statement fails to disclose: (i) the Company's terminal values; (ii) the unlevered, after-tax free cash flows that Zynga is forecasted to generate in the terminal year; (iii) the inputs and assumptions underlying Take Two's Financial Advisors' use of perpetuity growth rates ranging from 1.50% to 2.50%; (iv) the inputs and assumptions underlying Take-Two's Financial Advisors' use of a discount rates range of 6.50% to 7.50%; and (v) the weighted average cost of capital of Zynga.

40.     With respect to Take-Two's Financial Advisors *Discounted Cash Flow Analysis* for Take-Two, the Registration Statement fails to disclose: (i) Take-Two's terminal values; (ii)

the unlevered, after-tax free cash flows that Take-Two is forecasted to generate in the terminal year; (iii) the inputs and assumptions underlying Take Two's Financial Advisors' use of perpetuity growth rates ranging from 2.50% to 3.50%; (iv) the inputs and assumptions underlying Take-Two's Financial Advisors' use of a discount rates range of 6.50% to 7.50%; and (v) the weighted average cost of capital of Take-Two.

41.     With respect to Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis—Zynga Standalone*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying Goldman Sachs' use of a multiples range 10.0x to 15.0x; (ii) Zynga's estimated net debt as of December 31, 2023 and 2024; (iii) the estimated number of projected fully diluted shares outstanding of Zynga as of December 31, 2023 and 2024; and (iv) the inputs and assumptions underlying Goldman Sachs' use of a discount rate of 7.0%.

42.     With respect to Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis—Combined Company*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying Goldman Sachs' use of a multiples range 15.0x to 20.0x; (ii) estimated net debt of the combined company as of December 31, 2023 and 2024; (iii) the estimated number of projected fully diluted shares outstanding of the combined company as of December 31, 2023 and 2024; and (iv) the inputs and assumptions underlying Goldman Sachs' use of a discount rate of 6.0%.

43.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis — Zynga Standalone*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying Goldman Sachs' use of a discount rates range of 6.0% to 8.0%; (ii) Zynga's estimated weighted average cost of capital; (iii) the inputs and assumptions underlying Goldman Sachs' use of perpetuity growth rates ranging from 1.50% to 2.50%; (iv) Zynga's range of terminal

values; (v) Zynga's net debt as of September 30, 2021; and (vi) the estimated number of projected fully diluted shares outstanding of Zynga

44.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis — Combined Company*, the Registration Statement fails to disclose: (i) the inputs and assumptions underlying Goldman Sachs' use of a discount rates range of 5.0% to 7.0%; (ii) the combined company's estimated weighted average cost of capital; (iii) the inputs and assumptions underlying Goldman Sachs' use of perpetuity growth rates ranging from 1.50% to 2.50%; (iv) the range of terminal values for the combined company; (v) the weighted average cost of capital of the combined company; (vi) the pro forma estimated net debt of the combined company; and (vii) the estimated number of projected fully diluted shares outstanding of the combined company.

45.     With respect to Goldman Sachs' *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose: (i) the closing dates for each transaction; and (ii) the total values of each transaction.

46.     With respect to Goldman Sachs' *Premia Analysis*, the Registration Statement fails to disclose: (i) each transaction observed by Goldman Sachs in the analysis; (ii) the premiums paid.

47.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support

of its fairness opinion.

48.     Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions.  Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

51.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

52.     Defendants have issued the Registration Statement with the intention of soliciting

shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

53.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

54.     The Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

55.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

56.     The Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders

containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

57.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

58.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

59.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.    The Individual Defendants acted as controlling persons of Zynga within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Zynga, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially

incomplete and misleading.

61.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

63.     In addition, as set forth in the Registration Statement at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     Directing the Individual Defendants to disseminate an Amendment to the Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.     Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 25, 2022

Respectfully submitted,

By: */s/ Joshua M. Lifshitz*
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
**LIFSHITZ LAW PLLC**
1190 Broadway,
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*